SEXTON, Judge.
The plaintiff, Lowell L. Wilson, appeals the trial court’s granting of a motion for summary judgment filed by the defendant, Stone Container Corporation (Stone). We affirm.
On October 23, 1984, the plaintiff, an employee of Combustion Engineering, Inc. (Combustion), was injured while making repairs on a C-line filtrate tank at Stone’s paper mill in Hodge, Louisiana. As the plaintiff was attempting to remove a heavy piece of metal from the tank, he slipped on an accumulation of a slippery substance referred to in the paper mill trade as “black liquor.” He fell and sustained fractures to his right hand, contusions and abrasions to his left foot, and injury to one or more discs in his lower back.
The plaintiff filed a suit for personal injuries against Stone. In its answer Stone stated that the plaintiff was its statutory employee and that his exclusive remedy was under the worker’s compensation statute.
On the day of the trial, Stone filed a motion for summary judgment. Attached to the motion were the depositions and affidavits of five managerial employees of Stone and Combustion: John Newman, Jr., superintendent of maintenance planning at Stone; Paul Hayes, the current mill engineer at Stone; Donnie Briehn, superintendent of mechanical maintenance at Stone; A1 Wise, senior project engineer at Stone; and James Dousay, project manager for Combustion.
The depositions and affidavits reveal the following. Stone shuts down the Hodge plant for a short time each year in order to do extensive maintenance and repair at the plant. The engineering department, headed by Paul Hayes, decides what major maintenance projects need to be done during a shutdown. When the projects are complex, the engineering department hires contractors to perform the work. Combustion was just one of the contractors, although a primary one, hired by Stone to do work at the mill during the 1984 shutdown. The work which was to be done by Combustion during the 1984 fall shutdown was specified in a June 1984 letter agreement. (This agreement, attached to the deposition of Mr. Hayes, was labeled Hayes # 2 and will be hereinafter referred to as such.)
This letter of agreement appears to contemplate seven items of work which are summarized in Attachment II. This attachment also delineates the work to be done on “Unit #2 Lower Sidewall” which is described as “replacement work.” Attachments B through G (there is no attachment A) further delineate the other six items of work. We note that in addition to the Unit # 2 Lower Sidewall work, two other items of work are described as “replacement work.” One item is said to be “tube repair”; one is “concrete/structural steel removal”; one is “tank inspection and post weld heat treating”; and one is “retubing.”
It should be noted that item C of the letter agreement between Combustion and Stone states that the “[tjerms and conditions governing any order resulting from this quotation will be in accordance with those previously negotiated for the ‘Hodge Super Stretch’ program....” The Hodge Super Stretch Program (or contract) was entered into between Combustion and the predecessor of Stone, Continental Forest Industry, and covered some $71 million worth of work to be performed between 1981 and 1983. The record indicates that a *103 term of the Super Stretch Contract of special interest to Stone with regard to the 1984 maintenance contract was that pertaining to an “orange book agreement,” an agreement between the contractor and the union under which the union worked at reduced rates. There are other general terms which were obviously of interest to both parties to the 1984 agreement such as “Article 5.0 Final Payment,” “Article 7.0 Mutual Compliance,” and “Article 9.0 General” (this article dealt with such things as compliance with applicable codes, the requirement that the work be done in a workmanlike manner and the requirement that the contractor’s employees perform harmoniously with the workmen of other contractors and with those in the plant).
The maintenance planning department headed by Mr. Newman scheduled each job that was to be done during the 1984 shutdown and assigned workers to each job. The planning department scheduled an inspection of the filtrate tank involved in the accident. Stone’s mechanical maintenance department assigned two millwrights and a welder to inspect and perform minor repairs on the tank. However, the inspection revealed a greater degree of deterioration than Stone had anticipated as part of the baffle in the tank had corroded.
The tank itself is a holding tank which allows the liquor, a useful by-product, to settle out. The baffle is a metal device, either a cylinder or a flat plate, which controls the flow of the liquid through the tank. To repair a baffle, the worker cuts the deteriorated portion off of the baffle and welds a new piece of metal onto the baffle. Because it had not allocated sufficient manpower and hours for work on the tank, the planning department referred the job to the engineering department to in turn assign it to a contractor.
An authorization request, Stone # 1, was issued to request funding for the work. The repairs to the tank were then contracted to Combustion by means of a purchase order. The authorization request lists the project title as the “C Line Filtrate Tank Repairs” and gives an estimated cost of $50,000. The authorization request also states the following: “This project is an addition to the 1984 Major Maintenance Program and can be completed within budgeted funds.” The purchase order lists the cost of the baffle repairs in the C line tanks as $14,800. Mr. Hayes accounted for the large difference between the estimated cost and the actual purchase order cost for the baffle repair by explaining that several other projects besides the repairs covered by the purchase order were charged against the authorization request.
Hayes stated that when the need for additional work becomes known during a shutdown, Stone frequently adds additional employees. He also stated that, on the other hand, Stone may ask a maintenance contractor already performing work during the shutdown to extend the scope of its work to include the additional work.
The work that the plaintiff was doing was not specialized. Stone had approximately 100 employees who could have done this particular job. Stone employees had also done this type of work before. In fact, during the shutdown, Stone employees were performing similar work in other parts of the mill. During normal operations, a Stone employee did metal work on a tank at least once a week.
In his affidavit, James Dousay, the project manager for Combustion, stated that the purchase order formed no part of the general contract for the shutdown. The work was additional work requested by Stone due to Stone’s manpower shortage. In addition, Stone’s employees routinely do this type of maintenance and repair on a daily basis. A1 Wise, the senior project engineer at Stone, also stated that Stone’s employees normally do the type of work that the plaintiff was doing.
The trial court granted the motion for summary judgment. In oral reasons for judgment, the trial court found that “the plaintiff was not performing work under the super stretch contract, but rather under another agreement between defendant and CE” (Combustion Engineering). The court also found that “the work contract whose scope must be considered is the separate agreement to do repairs on the *104 tankThe court determined that tank repair was not specialized work, that it was part of the general maintenance done by Stone employees, and that it was common practice in the paper mill industry for mill employees to perform this type of maintenance.
Summary judgment is available only when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” LSA-C.C.P. Art. 966; Thompson v. South Central Bell Telephone Co., 411 So.2d 26, 27 (La.1982); Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087, 1089 (La.1981). The burden is on the party moving for summary judgment to demonstrate that there is no genuine issue of material fact. Klohn v. Louisiana Power & Light, 406 So.2d 577 (La.1981).
In Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986), the Supreme Court set forth a three-level analysis for determining the existence of a statutory employment relationship. The first inquiry is whether the contract work is specialized or nonspecialized. The focus is on the scope of the contract work, not the specific task to which the injured employee is assigned. If the contract work is specialized per se, as a matter of law the work is not a part of the principal’s trade, business, or occupation, and the principal is not the statutory employer of the specialized contractor’s employees. This inquiry is a question of fact. The court should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field.
If it is determined that the contract work is nonspecialized, then the court examines whether the contract work is part of the principal’s trade, business, or occupation. The last inquiry is whether the principal was engaged in the work at the time of the accident.
It is clear that the contract work at issue was not specialized and that the plaintiff was engaged in the work at the time of the accident. Therefore, the central inquiry under a Berry analysis in the instant case is to determine the scope of the contract work (rather than the specific task assigned to the injured employee) that was being done at the time of the injury.
The plaintiff contends that the purchase order providing for the tank repair was merely an addition to the 1984 major maintenance contract which was part and parcel of the Super Stretch Contract, and thus the scope of the Super Stretch Contract, as well as the 1984 major maintenance contract, must be considered to determine the scope of the contract work at issue. The defendant, on the other hand, contends that the work was being done under the purchase order as a separate contract.
It is clear to us that if the work was done under the purchase order (Stone # 1), then under a Berry analysis the plaintiff was indeed a statutory employee. It also seems clear to us that if the work was being done under the original Super Stretch Contract by way of the major maintenance contract, the plaintiff is not a statutory employee. While there is not a great deal of testimony in the record as to the nature of the work involved in the Super Stretch Contract, Article 1 thereof, “Scope of Work,” clearly shows that this was major' work which, while including some repair, contemplated extensive demolition, removal, and replacement of major factory components. It appears conceded that the work under the Super Stretch Contract was not part of Stone’s principal trade or business.
It is thus further clear that the 1984 major maintenance contract was not an extension of the Super Stretch Contract of 1981-1983. One of the articles of the 1984 major maintenance contract simply incorporated the “terms and conditions” of the Super Stretch Contract for convenience. The record clearly indicates that the work involved in the 1984 maintenance contract, although significant, was regular and routine maintenance, a different type work than that of the Super Stretch Contract. However, these determinations do not resolve the issue.
*105 From this record we are unable to specifically discern whether the purchase order was a separate contract or was part of the 1984 major maintenance contract. We are inclined to the view that the purchase order was part of the major maintenance contract. We are particularly influenced in this regard by the statement on the purchase order that the project was “an addition to the 1984 major maintenance program.” In other words, we are inclined to disagree with our learned trial brother below that the tank repair was done simply under the purchase order. We think not, but we are not so certain that the record establishes either circumstance sufficiently to award summary judgment.
However, we further determine that this view is not fatal to defendant’s position. We conclude that it is of no moment whether the work was done under either the purchase order or the major maintenance agreement of 1984. It is our view that even if the work was done under the major maintenance contract, the plaintiff was a statutory employee of the defendant.
General maintenance and repair work, which by their nature allow for the smooth and continuing operations of the principal, are part of the trade, business and occupation of the principal. Rowe v. Northwestern National Insurance Co., 471 So.2d 226 (La.1985).
Recatto v. Bayou Steel Corp., 508 So.2d 877 (La.App.5th Cir.1987), is a factually similar case in which the trial court determination on summary judgment that the plaintiff was a statutory employee was affirmed on appeal. Bayou Steel shut down its plant for two weeks each year to inspect machinery, perform repairs, and engage in preventive maintenance. Because of the scope of the project, all of Bayou Steel’s maintenance employees participated. Occasionally, Bayou Steel faced a manpower shortage and would contract with Bayou Maintenance, Inc. for electricians. One of Bayou Maintenance’s electricians was injured while working during the shutdown at Bayou Steel. The court characterized the process of changing damaged cable trays, during which the plaintiff was injured, as repair work normally performed by the defendant’s employees and declined to characterize the activity as “new construction” or “major modification.”
The instant work was the repairing of a deteriorated baffle in a holding tank. Stone had any number of employees who could perform this type of work and who did so on a regular basis. The work was apparently added to a contract described as a major maintenance contract being performed by an independent contractor during the mill’s yearly shutdown. The tasks that the major maintenance contractor was involved in were described as: replacement, inspection, removal, repair, and re-tubing. These descriptions, as well as the details of the work set out in the major maintenance contract, together with the depositions of those involved in planning and negotiating this work, show that the major maintenance contract work involved was general maintenance and repair within the capability of the mill’s employees and was thus regular and routine work.
Accordingly, we view the work involved in the instant case, the repairing of a deteriorated baffle in a holding tank, not to be specialized, but to be regular and routine maintenance normally performed by the defendant’s employees — whether being done under the purchase order contract or whether within the scope of the 1984 major maintenance agreement. For the reasons aforesaid, the judgment appealed is affirmed, and costs of this appeal are assessed to appellant.
AFFIRMED.